We'll hear argument next in number 2007-1415, Agrizap v. Woodstream. Now this is a cross appeal. I take it that Woodstream is going to go first, is that correct? And I further take it that Agrizap has not reserved any time for Sir Rebuttal, is that correct? I have. Oh, I'm sorry, I see that you did. Yeah, you reserved five minutes for Sir Rebuttal. Okay, I misread the sheet. Very good. Thank you. Mr. Slaboski, you can begin when you're ready. May it please the Court. Woodstream appeals from adverse decisions of JMLL on the fraudulent misrepresentation issue and pending validity and equitable conduct issues. I'll start off with the fraudulent misrepresentation case. Fraudulent misrepresentation had to be proven by clear and convincing evidence. We submit that there was... You've got a lot to cover in only ten minutes. Do you mind if I move you a little bit? I will not move you. Okay, so how about the sufficiency of evidence? My understanding under Pennsylvania law is the sufficiency of evidence to support the damage award has to be established by reasonable certainty, is that right? That is correct. Help me out with what was the evidence that was offered in contradictory evidence? I'm just trying to figure out how the jury came to 1.275. That's a good question, Your Honor. We all are. Well, there was evidence about $50 million, 50% of $20 million over five years, right? That's the market share that you all believed you were going to capture with this invention. That was a document that was prepared in 2003, three years after this alleged misrepresentation. But am I characterizing it right? You believed that you would capture a market share of $50 million ultimately because it would be 50% of $20 million a year for each of five years, is what the document said. No, I don't believe the document said that. I believe it's a cumulative amount of $20 million. And it was a hoped-for market share of 50% of it. So why doesn't that give enough reasonable certainty? I mean, clearly, okay, so say the patentee says, please award $5 million, and the defendant says, no, award at most a million if you found us guilty, and the jury comes up with 3.5. The fact that nobody ever suggested 3.5 doesn't deprive that verdict of any kind of reasonable certainty, does it? I mean, if that were the case, you wouldn't be standing here appealing and saying that verdict is speculative, would you? There is no evidence that links this 2003 document that expresses Woodstream's hoped-for market share of an electronic pest control device from the years 2004 to the years 2010. There is no linkage, there is no testimony at all that links that hoped-for market share to a misrepresentation that occurred in the year 2000 concerning the intentions and integrity of Woodstream's offshore manufacturing. It is fanciful, it is totally contrived, it's as if you just waved the document before the jury and said, look what Woodstream hoped to achieve, we want some too. No, I don't think that's a fair characterization, is it? I mean, come on, the fraudulent misrepresentation, if we were to affirm on that point, would be a conclusion that the jury reached in which they clearly concluded that you all had misrepresented your intentions in the response to Agrasap when they asked you, wait a minute, this disclosure ought to be for the confidentiality. I'm assuming, we're not going to get into that right now, let's just assume that. So why wouldn't the 50% of $20 million a year for five years be a form of damages that might be appropriate? Because the advantage that you got from the fraudulent misrepresentation, if we assume there was one, and it was appropriate, was that you got advanced early entry into the market. So why wouldn't that be something that the jury would properly consider in the course of the lead time that you got being the huge advantage you achieved? Look, if they come out with a patented invention, it comes out tomorrow, you can reverse engineer it, design around it, and offer your own product, which is to assume what you would say you did, except that you did it here when they gave it to you confidentially. So that's the problem. So why isn't this all about the lead time? Well, there's a lot of things that you said that there was no confidential information ever given to Woodstring. Okay, well, as I said, let's move beyond whether there was or wasn't a fraudulent misrepresentation, because I'm trying to focus only on damages and whether there was reasonable certainty. There is no... The sales were made by AgriZep to Woodstring from the years 2000 to 2003. There is no dispute that in 2003, whether there was a misrepresentation or there wasn't a misrepresentation, Woodstring would have been on the market. Whatever damage occurred post-2003 was due to competition among a party that had every right to be on the market, whether there was a misrepresentation or not. Council, we reward people all the time for advantages they might have gotten from future sales, if the future sales were the result of getting into the market early, securing connections with suppliers, with buyers, and everything else. So why... Because, first of all, there was no getting into the market early. AgriZep had been selling this product since 1995, five years before it ever started selling to Woodstring. It was the one that was first in the market. Second of all, it is not right. So wait, the product that they gave you and attached all these confidential restrictions to, and you guys signed, that product was freely available in the market? Oh, absolutely. Then why did you sign something saying you agreed to keep it confidential and then send it to a supplier? No, that's not quite what happened. What happened is when the parties started to negotiate an arrangement, Woodstring presented, as is not unusual, a typical confidential disclosure agreement so that during the course of negotiations, if there was any confidential information that the parties had to exchange, it would be protected. But in fact, and the judge... I must say, Judge Kelly was very concerned about this and in sidebar said, you know, this jury is getting misled, and I mean seriously misled, by these allegations of confidentiality. Judge Kelly said, this is a product that you can buy at a hardware store. Where's the confidentiality here? And there was none. But when the parties started their discussion, you entered into a confidentiality agreement to protect any confidential business or technical information that might have been exchanged. Now, as far as technical information goes, there was not one iota of evidence that any confidential technical information was ever given to Woodstring. Woodstring sent, when it first was evaluated... If there wasn't any confidential information, why would Woodstring respond to Agrizep the way they did? It did not respond at all the first time Agrizep said, hey, wait a minute, why are you sending this product to the supplier? You're not breaching our confidential agreement, are you? Woodstring doesn't respond. Then in response to a second query, finally Woodstring's response is, oh, we sent it to our supplier only for this other reason. Why would Woodstring reply that way if it wasn't confidential information? Testimony's not there, but perhaps, I think Woodstring was puzzled as to why there was even a reference to the confidentiality agreement. Agrizep was mistaken. Agrizep didn't think the confidentiality agreement had already been signed or that the product hadn't been sent over for costing prior to it being signed. But in any event, yeah, it's possible that Andy Woolworth of Woodstring was puzzled by this reference to the confidentiality agreement. In any event, Agrizep insisted that this was covered by the confidentiality agreement, and Woodstring had no problem in saying that this offshore manufacturer, this Chinese manufacturer who was trustworthy, and we've done millions of dollars worth of business with. Was that false, by the way, the millions of dollars worth of business? What was... Was... There was a mistake. The testimony's unclear. What Woodstring said is that this is a reliable manufacturer. It's someone that Woodstring has done millions of dollars worth of business. The testimony at trial, and it was never clearly established, but it may have been only several hundred thousand dollars worth of business. Okay. That was the confusion. Was it a material misstatement? It was not. There is not... Going back to the question that was asked earlier, where does $1.275 million come from? This has been briefed extensively at the JMOL stage. It's been briefed before this court. You can put pen to paper in all different ways, and you cannot come up with any fathomable basis for that number. It's... Well, if it's framed within the way the facts were presented and the case was argued, the jury has to come up with that even though it's not mathematical certainty, correct? It does not have to be mathematical certainty, but there has to be a reasonable certainty, and there was no reasonable certainty. There is no evidence. In fact, no number was ever presented to the jury in closing. You know, there is one financial event that was proven with reasonable certainty in this case, and that was from the years 2000 to 2003, as a result of this alleged misrepresentation, Agrasat sold 11,000 units to Woodstream and made $250,000, and that is the only reasonable certain evidence of any financial activity that was proven in this case. Counsel, if you don't mind, would you move to... I know you don't have much time left, but would you move to your appeal of the obviousness determination and tell us why we should overturn the jury verdict on obviousness? Yes, Your Honor. If I were a law professor, I don't think I could think of any better fact scenario to demonstrate obviousness. Well, there's a lot of evidence here of objective consideration evidence, right? I mean, they showed commercial success. Hey, you were going to take 50% of $20 million a year. That seems like success to me. Well, I dispute that that has anything to do with commercial success, but there was no commercial success evidence presented at trial. There was no testimony that linked any commercial success to the claims of the patent in suit. It was not an argument that was presented, as I recall, in closing argument by opposing counsel. Was it presented at trial at all? It was not presented at trial. No evidence of commercial success was ever before the jury? Well, there was. The only time commercial success entered into this case was during the cross-examination of Dr. Eldering, Woodstream's expert, and Woodstream's expert gave, of course, his opinion that this was obvious, and in cross-examination, plaintiff's counsel said, well, did you consider commercial success? He said, no. Did you consider long-felt need? Did you consider all these things? And he said, no. Why? Because it wasn't in evidence. And that is the only evidence, the only time that issues of commercial success, long-felt need were raised in this case. They didn't put that evidence in through any independent witnesses or experts? That's correct, Your Honor. Nothing? There was no expert testimony of patent damages. Yes? Was your obviousness contention raised as an affirmative defense or as a counterclaim? It was raised both. But it was as a counterclaim, right. It was raised as a counterclaim. And with respect to the asserted claims only or with respect to all the claims in the patent? I don't recall. I believe at the time the claim would have been raised. It was probably before there was identification of which claims were being asserted. In other words, it's part of the standard for plot. So your belief is it's to the whole patent? It's to all the claims? Because they might not have asserted claims? No, I believe it's just the claims. We've only presented evidence on the claims asserted. Those claims asserted are counterclaims. So you've effectively withdrawn such of your counterclaim as applied to non-asserted claims? That's right. We're only contending the asserted claims are invalid for obviousness. In terms of obviousness, this is one of those rare cases. You don't have to worry about your rebuttal time, by the way. We will not hold you strictly to the time at this. Thank you. I will address obviousness because it came up at this point. This is an unusual case in which the accused infringer says the patent office got it right. During the examination of this patent, the examiner said that these claims are invalid for obviousness over AgriZette's earlier patent, the 091 patent. The examiner said the 091 patent had everything in the patent claim, save for one difference. It included a mechanical strip so that when the pest stepped on these plates, contacts were made and the pest was electrocuted. That's the only difference between the prior art and the claims, and that's not been refuted. That's not been refuted or challenged by AgriZette. What they challenge is that the substitution of a resistive switch in Dye and Madsen was not obvious. Now, let me ask you this. The resistive switch in Dye and Madsen, did that switch – I mean, it's hard to call it a switch. It's really just – I mean, if I touch the handle of the door to my office and I get a shock, I guess I'm a resistive switch at that point. But set that aside for a moment. Is the resistive switch mechanism including, for present purposes, the two-stage triggering mechanism, that is to say, first the detection circuit and second the ZAP circuit, the high-voltage circuit, was that found in Dye and Madsen? No, what was found in Dye – that two-stage was found in the earlier 091 patent. Right. So you're saying – this has been a subject of some confusion for me, so straighten me out. You're saying that the resistive switch, in the sense of what was not in the 091-slash-Gopher-Zapper, was only the difference between the metal plate making a contact switch and the rodent touching both electrodes or the electrode – is it two electrodes or is it the electrode in the ground? Is that it? Is that all that was – Let me explain it this way, if I can. I hope I'm responsible for your question. In the Dye patent, there were a set of electrodes that were called the sensing electrodes. When the rodent crossed those sensing electrodes, a circuit was completed and a high-voltage generator was actuated to electrocute the rodent. But is that one step or two? In other words, as I understand the operation of this patent – It was one step. As soon as you touch it, as in my touching the handle, there's no first circuit that determines, ah, he's here, let's hit him, and a second circuit that then hits me. In the patent, and I take it in the 091 as well, there's a first circuit, a low-voltage recognition of presence, followed by a triggering. I mean, I take it that the first circuit has a capacitor or something in it that builds up. Yes, in the earlier 091 Gopher Zapper, it included – and I refer the court to the testimony of Patrick Frey, who was the in-house engineer, if you will, at AgriZap, who was the guy working on the conversion from the pressure switch to the resistance switch. And he testified as to the Gopher Zapper. He said the Gopher Zapper had a pressure switch. It was activated by the weight of a rodent. It then triggered a triggering circuit, which then activated a high-voltage generator for a predetermined time period. Once activated, it could not be reactivated until it was reset, that is, it was inhibited. You happen to know where in the appendix this is? Yes, this is at A8900-8903. He also said, when we changed to the resistance switch, there were no problems. The resistance switch required very little testing. That's at 8905. What he did say was a problem, and this was a problem throughout, even for the old Gopher Zapper device. Because high voltage was being generated, it had a tendency to burn out portions of the circuit. So they hired this consultant, Bruno Rist, who, by the way, was one of the original Canadian inventors, to solve that problem. And they gave him one of the early Gopher Zappers with the mechanical switch. He, in solving the problem of the burnout, independently came up with the concept of using a resistor switch. He said it was an obvious conclusion, because if you were going to have a pair of electrodes that delivered the high voltage, why not use those electrodes to also sense the presence of the past? So the evidence of obviousness was clear and convincing, and the evidence in Roboto was insubstantial. How about the reset mechanism? Set aside the written description issue for a moment. And the reset mechanism as it relates to obviousness, was that present in the prior article? Oh, yes. In which? In the Gopher. Oh, yes, in the Gopher Zapper. The Gopher Zapper 091 was stipulated to be identical. All right. Except for the switch. Except for the switch. Except for the resistor switch. That's what was stipulated. I just want to make sure I understand. No, no, you're right. The Gopher Zapper, the prior article, and the 091 patent are identical. And the difference between those and the patent in suit was the substitution of a resistor switch for a mechanical switch. Was there any argument other than the resistance switch about what might have been missing from the Gopher Zapper? Did anyone produce evidence or argument at any time that other elements of the claims weren't present in the Gopher Zapper? No, Your Honor. And in fact, there's a very interesting exhibit that Dr. Elderling, the expert for Woodstring presented, where he actually took Claim 16 and he made a hypothetical claim chart and he struck out resistance switch, and he put a mechanical switch and then he compared it to the prior Gopher Zapper and it was a 102 reference. I mean, otherwise it was identical. No, no, that's your argument, but did they put forth any evidence? No. Their evidence against the obviousness was that there was no teaching, suggestion, or motivation to make the combination. And with respect, same answer with respect to all the other claims, 1, 2, 3, 5, and 10? There was evidence presented where our expert went through those. It was also shown in the prior Gopher Zapper. But was there any contention on their part that there were elements in those claims that were not present in the prior one? There was no evidence. There might have been conclusory testimony from their experts saying, I don't find that letter, but there was no. Okay, just one last question before you sit down, which is do they contest whether or not the Gopher Zapper, not 091, we know that's off the table because of the change in inventorship, but the actual public use, which is the prior art that you're referring to, do they contest whether or not that is appropriately prior art? No, it's not contested. It was determined on summary judgment that it was prior art. It was stipulated by the parties and was part of the stipulation, Defense Exhibit 230, that was presented to the jury. And indeed, in the judge's instructions to the jury, he said that it's been found to be public use, and there was no objection to that. Okay, very well. Thank you. We will restore your rebuttal time. Why don't we hear from Mr. Mark? Good morning, Your Honor. I'm Joel Mark for Agazep. Dealing with the fraud claims, just briefly, before we go into the Claim 16 issue, I think that turning to the issue of damages, which seemed to be of interest to the court, the Delahunty case is the case which should guide us. And it says that the jury's report of damages should not be interfered with unless it clearly appears that the amount awarded resulted from partiality of the priest, prejudice, corruption, or some other improper influence. I have not seen any of the briefs or the argument, but Woodstream suggests the facts upon which a finding of any of those conditions might exist. Well, that Delahunty case also says the damages must be based on reasonable certainty under Pennsylvania law. So what is the reasonable certainty for the 1.275 damage award? And I'm not meaning to suggest that you've got to prove that you argued 1.275, but what evidence did you put forth with regard to how damages should be measured? Let me answer that in just a minute. But I think that we also ought to have in the mix the concept that the law doesn't require that there be a formulaic expression of how the damages are calculated. No, but to pick up on Judge Moore's point, I read Delahunty and I was struck that they actually were requiring some degree of specificity. The language that caught my eye, not only what Judge Moore just read, but although the law does not command mathematical precision, sufficient facts must be introduced so that the court can arrive at an intelligent estimate without conjecture, i.e. estimates okay, conjecture not. Where is the estimate here? All right, let's start with the Woodstream figures on what it predicted the market was going to be. And I don't think Woodstream can have it both ways. Woodstream has argued throughout this case that those sales prediction documents that they use in their business are thoroughly vetted all the way up through their management. They have to be signed off at various levels of management. I don't think it's correct, then, for them to turn around and make the contention that those sales figures that they predict based on industry figures are not sufficient for the jury to look at in terms of determining what the market might be. Then the next step in making a reasonable estimate, I think the district court— And wait, the figures that you're—the sales figures you're talking about is what I kept throwing at them, 50 percent for 20 years. Right. For five years. Right. Sorry, 50 percent of 20 million for five years. Their prediction on what the market is likely to be for this product if it's entered into in the proper way. How does that get you to what your damages should be for the fraudulent misrepresentation? That's a speculation on their part, or even if it's a detailed study on their part of what the market will be. But clearly your damages aren't the entire market, right? Right. So what would your—how do we get from there to there? There was testimony in the record that but for the misrepresentation, Agrisac would not have sold any product to Woodstream and thus would have had a three-year head start. That happened in the year 2000 when the evidence was that Woodstream had turned the corner on profitability. Was it true that your products were already in the market? Yes. So they could have just gone to the hardware store. I assume these are not sold in hardware stores, but—or maybe they are. You tell me. They are. Okay. I didn't know if they were sold by pesticide companies or some pest control companies. But anyway, in any event, so they could have gone to the hardware store and gotten one. So why do you assume there would have necessarily been a three-year lead time? Because that's how long they worked on trying to come up with their own product before they finally went with the electronics and the Agrisac product. But no, but— There was testimony they dealt with a treadle step— Sure, sure, sure. But that's—you're now assuming they never get to see yours, right? There are two ways they could get to see yours. They could get to see yours because you gave it to them, or they could get to see yours by going and buying it from the publicly available source. The evidence was—and I think maybe the problem was that the evidence was that the contract prepared by Woodstream referred to it as a confidentiality agreement, when really it was Agrisac's intention to have it as being the agreement which is going to govern their sales on a—what do they call it?—purchase order basis. In other words, Agrisac—Woodstream certainly could have done what it did, but it decided to go through this product because it was more reliable, had been developed, or for whatever reasons they had. There's no dispute that they decided to go this route and sign this agreement. I agree with you there's no dispute that they took your product, reverse engineered it, and came up with your own, but I'm trying to get to the measure of damages. You want me to give you somehow or think that the jury gave you full three years of lead time that Agrisac would have dominated the market without Woodstream's entrance. But that assumes that they couldn't have gotten the product elsewhere. That's what I'm a little nervous about. Well, I think what the district court had it right in several respects. First of all, the fraud gave Woodstream the sooner entry into the market, and in a way that allowed them to capitalize on an existing product because they co-branded it, where Woodstream couldn't have done that otherwise. They would have had to come up with a brand new product. Second of all, the fraud gave Woodstream the ability to manage Agrisac's now further entry into the market as they did, and there was evidence that they did manipulate the market. And that's at 04250, which is their internal series of emails back and forth where they say a buyer wants 10,000 units, but let's hold them to 2,000 until we get our product, our rat zapper on the market. So it allowed them to manipulate the market in certain ways. And third, it gave them the ability to compete against Agrisac with the product that was developed from its own brand. I don't actually doubt that if everything happened the way you're saying you're entitled to damages, my problem is all about the amount. I can't figure out where it came from, so focus on that. The jury had to make a reasonable estimate as to how much those delays, those factors, those manipulations, and that competition suppress Agrisac's further growth into this market. And the number they picked is approximately 2% of the market penetration that Woodstream had predicted. Did you ask for 2% of the market? I mean, you're giving me a percentage now, but what I'm wondering is what evidence was before the jury that led them to the conclusion 1.275 million is appropriate? Did you stand up and send them a message signal? I mean, what was your closing? What was the evidence? Did you give them a number? No, no. What did you say when you go back there, ladies and gentlemen, to determine the damages? Reasonable damage based on these factors. And will you suggest you didn't say? No, I don't recall. I don't believe there was a suggestion. I might be incorrect. Were you trial counsel? No, I wasn't. I've got the disadvantage of that. I think that the closing argument is in the record. I'm the new kid to the case, so I'm not the class historian. I apologize. But we can look at the record. But those are the factors, I think, that the district court cited in its decision on this issue that clearly were significant to it as it viewed the jury viewing the evidence. And that evidence, I think, can make a reasonable basis for an estimate sufficient to survive Delahanty, especially when there's no evidence of any other factor at work, such as caprice, prejudice, corruption, or improper influence. None of those factors are there. There is a basis where one could say there's a reasonable estimate can be made of very modest one, only 2%, is what the suppression and competition claims. Well, reasonable means based on reason, and the only reason that I hear is that it was less than the total. I mean, it was not only less than the total amount of the anticipated market, but what is a relatively seemingly small percentage. But that's not a whole lot of reason. The other thing is you can look at which group's sales of the 600,000 units in the big box stores, which AgriZap stayed out of pursuant to their arrangement. And you can look at... Was that evidence all before the jury? Yes. The 600,000 and the profit on each of them, what, $10 roughly? It changed over the course of time. I think it was $9. Yeah, but it went from 9 to 12, I think. Yeah. So that would be about 6 million. Right, so... Okay. Would you mind, if it's okay with others, would you mind moving on to the obviousness issue? Let me talk about the obviousness. I guess the answer is it was so obvious, why didn't the largest road and track maker in the country figure it out itself any time sooner? It couldn't have been that obvious or they would have done it. But looking at the actual prior art, you've got maps... Before you go into that, was there evidence of... I could have sworn, maybe I'm just misremembering, but that a lot of your argument was based on objective consideration evidence. Commercial success, long felt need, and all of that. And I am understanding your adversary to suggest that there was no evidence in the record of that. And I want you to set the record straight if it needs to be. Well, the 600,000 sales of Woodstreet's product. They had success in the market, which they didn't have before they used this technology. Going into big box stores, their own predictions of what they would get if they had a working electronic product. Those are all things that are in the record that show that there was commercial success either in fact or predicted because of what they knew about the product. But here's the problem, you have to show a nexus too, as you know with our law. The commercial success has to, the patentee has the burden, if they're going to use commercial success evidence, of showing a nexus between the sales and the patented invention, as opposed to any other possible way of doing this. So, how do you get through that difficulty? It's also correct that at that time, in the year 2000, when they developed, they developed the RAFZAPPER. RAFZAPPER developed its product and it was the only commercially successful viable electronic trap on the market. The evidence of that is that A10513, and I apologize for the brief, I think I misput that down, it was an error. So, they had the only commercially viable product on the market and it was the only product that used this resistive switch. And so there was no other commercial success of that nature or any other attempt at perfecting this electronic way of electrocuting robots. Now, going to the prior art of the Madsen... Was there any evidence of long felt need or unresolved... Their own sales prediction memo talked about what the need there was for this in the marketplace. Absolutely. Where would I find that? You don't know, the same thing we've been talking about. Oh, the same one. I didn't know if there was more. No, I'm familiar with that one. So, they were saying there's a great unmet need for this kind of product and we want to be first in. And that's why they said in an internal memo, let's go through AGRZAPP to get the technology. That's what they decided was the fastest way to do it as opposed to some kind of reverse engineering or trying to design around. That's what they decided was the best way to do it and that's what harmed AGRZAPP. Now, getting back to the obviousness on the Madsen and Dye as prior art... Didn't have a switch to turn on or to activate the high voltage or the business voltage part of the item. The switch in Madsen and Calicard was the human who prodded it. Well, it was when the animal came between the two electrodes, I think. But nothing switched on. It was already on. The animal has completed the circuit and that's not the same thing. We're using the term switch, I think, maybe in somewhat different ways. I take it you're using the term switch to refer to the particular aspect of the invention which first throws a low voltage charge through the circuit that has just been completed by the unlucky animal and determines the presence of the animal for a particular period of time and that switch is on, the generator then hits the animal with the large charge, right? Correct. Alright. Now, that's the switch because that's the thing that makes this unique. Okay, that timing device, however, I take it was present in the Gopher Zapper, correct? Yes. Albeit in connection with the mechanical switch that said the animal has to actually depress the plate in order to connect the circuit, right? Yeah. Okay. And in order to meet the patent examiner's question about obviousness in prior art involving the 091 Gopher Zapper, Agra Zapper did the more expeditious thing of simply filing a continuation. Right, but it turns out that really didn't make any difference because the Gopher Zapper is prior art anyway. You don't disagree with that. Well, it preexisted. Right. So, it's as if it had been a patent which had been invented by a different inventor, right? It's prior art. They filed a continuation. I understand, but since the Gopher Zapper is the exact commercial embodiment of the 091 and the Gopher Zapper turns out to be prior art, then we're sort of back to exactly where the case was when the examiner had the impression that the 091 was prior art. Isn't that correct? That's what I understand to be the predicate. There's substantial differences between even the mechanical switch and the resistive switch, and I don't think that you can say under the case art. Well, let's back up to the question I have. I want to be sure I'm right about this because it's sort of the way I'm thinking about this whole obviousness question. Is it true that, number one, that the Gopher Zapper is the commercial embodiment of the 091? I take it yes. Yes. Okay. Is it also true that the Gopher Zapper, our purposes here, we ought to deem that to be prior art to the patent in suit? Well, not as in terms of the resistive switch. No, no, no, no, prior art. I mean, I understand. All right. So, it's prior. So, what I'm trying to say is, in effect, substituting the actual Gopher Zapper for the 091 patent brings us right back to where the examiner was when the examiner had before him Dye, Madsen, and the 091, right? And he concluded Dye and Madsen plus the 091 obviousness, right? And that's our inquiry is effectively the same inquiry because we've just substituted the Gopher Zapper for the 091, right? Well, the jury had a different conclusion. Well, I understand, but the question is how are we to look at this case? I imagine you would say the jury had all this evidence of commercial success and the examiner didn't, or did they? Did the examiner have that? I don't know. The examiner didn't have that. No. Didn't have any of the secondary factors before it, and so there was a different set of facts that each had to back. Apart from that, though, there weren't differences, apart from the objective consideration evidence. Examiner reached one conclusion, jury reached the other, and the only difference that I see is the objective evidence. Is that correct? Well, that's correct, and also that I think that the jury's verdict is supported by the fact that the resistance switch is qualitatively different than all the mechanical ones. It wasn't just an obvious thing to do it because all the people who've been working on this have been working on mechanical switches, and nobody could get it to work, and I don't think it was obvious to any of them which stream they've been working on or who's researching it, and nobody had come up with this, trying to employ a mechanical switch. So I think it was not obvious to employ this resistive switch in the way they did it. So I think that in addition to these other factors that the jury had that the examiner didn't. I'd like to take a moment now, if I have any time, to talk about the— Yeah, we are giving, in fact have given, and we'll give your opposing counsel some extra time, so we'll give you a few extra minutes. Although you've reserved some time for Sir Rebuttal, so you should try to make it quick. I assume you want to touch upon Claim 16. I do. Do I understand your argument to be the district court erred in assuming and reading overhead door as broadly as they did? Yes. Yes, and that microprocessor, according to your expert, could and did in this case contain the exact hardware, namely the trigger and other elements, and that this case is different from overhead door on the basis of overhead door involved a claim to a trigger and a microprocessor separately, and that these claims do not do that? Yes. Okay. And I think to read overhead door to require that if it's in a microprocessor it can't also be separate in every case is incorrect, because we're talking about electronic circuits which are made by digital logic, and whether you lay them out one by one and wire them together or you manufacture them— Or you put them in a box. —in a microprocessor and they're wired together by the programming of the microprocessor, you've still got the identical circuits functioning in the same way, talking to each other in the same way, and that's where we think the court went wrong with overhead door because it didn't limit its inquiry to comparing the mechanical portions to the mechanical portions and the electronic portions to the electronic portions, and I think it further misread overhead door in terms of any switch that isn't in the microprocessor but is somewhere else automatically meaning there could be no literal infringement. When it comes to the science we're talking about, a microprocessor is a manufacturing device. It manufactures these circuits. It doesn't become them in some way. The programming manufactures them, and I suppose you could say that when you turn off a microprocessor those circuits no longer exist in the physical embodiment, but every time you turn it back on the software recreates them, and so it can't be used except by having in them the physical circuits that are described in the patent. And I think Dr. Feinberg's testimony supported that, and then the final comparison that I think Woodstein tried to make, which is I think erroneous, is that they said, well, you describe a preferred embodiment as being discrete circuits wired together and not a microprocessor, but the patent didn't limit itself to the preferred embodiment, and I think that it was error to consider that comparison only as to the preferred embodiment. As a matter of fact, the patent says it can use any type of digital logics, including microprocessors. Very well. If you have nothing further, we'll hear a rebuttal first from Mr. Slaboski, and then we'll give you a chance to come back on the survey if there's anything that's raised with respect to the cross-appeal. I want to speak to the so-called three-year head start. The fact that Woodstream sold RADZAP-er products for three years may have been a benefit to Woodstream, but that's not the issue in this case. The issue is how was RADZAP injured by selling products to Woodstream for a three-year period, made $225,000, sold 11,000 units, when Woodstream had access to customers that AgriZap would never have obtained in six years prior? How is that – you know, there is such a thing as a win-win arrangement. Was that evidence before the jury, that AgriZap would not have had access to these customers? There is evidence that they did not have access to the customers. Not that they couldn't have had access, but they couldn't make sales to these customers. There is evidence that they – But you're telling me they couldn't make sales to these customers, but there's no evidence in the record to suggest that. I don't know if they're – And do you mean they couldn't have made sales because they couldn't possibly have handled the volume, or they couldn't have made sales because they didn't have the contacts, they didn't have the outreach? They didn't make sales. They never turned a profit in five years before they came to Woodstream, or before Woodstream and AgriZap got together. Woodstream's sales to the customers were big box-type customers. AgriZap benefited by selling to Woodstream in this three-year period. Keep in mind that, first of all, during this entire period, AgriZap was competing. Woodstream was taking AgriZap's product in AgriZap's boxes with AgriZap's name on it, AgriZap's logo on the box, AgriZap's slogans, they had the rat with the rat zapper, it had AgriZap's patent number, there were some stickies on the box that put Woodstream's trademark on it, but AgriZap was, for three years, was taking – oh, I'm sorry, Woodstream was taking AgriZap's box, and AgriZap was boxing it, and selling it to the big box customers, the Home Depots, the Targets, the Walmarts, customers that – and I believe it's not controversial – that these were customers that AgriZap didn't have an entree to. Some evidence, though, that the Woodstream marketers reduced the volume below what it could have been, and the jury could conclude that was in order to keep Woodstream at the top and AgriZap not in a dominant position. Well, the evidence is extremely muddled, and I would suggest that – But there's evidence. The jury could have considered that evidence as an attempt by Woodstream to reduce AgriZap's sales. There would have been no motive to do that. There would have been no motive to do that. Why not? They knew they were coming online, and they didn't want to do anything other than keep this bridge to the retailers open. This is Woodstream's own customers. Why would Woodstream engage in a plan not to sell product to its own customers that it wanted? Because it expected to come online soon and wanted to get as much of that inventory supply as it could, to be the supplier for as many units as it could. There is some evidence that they contend that Woodstream built up its inventory because it was concerned that when AgriZap found out that it was coming out of a mousetrap, it might cut them off. This was not damage to AgriZap. Woodstream bought more product than it needed. You don't have much time left. Do you want to move to the future? I do want to say one thing about this commercial success. For five years, their product was sold, was not commercially successful. They enter into this arrangement with Woodstream, and now they say that's commercial success. It's reasonable to assume that the commercial success was attributed to the fact that Woodstream had a greater sales force, and had access to customers. And that is insufficient to tie it into the patent claims. That's where the commercial success, if there was any commercial success, and there was hardly a significant amount of commercial success, but if there was commercial success with the RATS effort, one must attribute it to Woodstream's ability to sell product. So you're saying that there's no nexus. There is also no nexus, that's correct. Now, there's this thing about reverse engineering and cloning, and that's the other thing the judge was disturbed about, using this charged word cloning. He was saying the jury is getting seriously misled here. There was no reverse engineering or cloning. Woodstream, during the course of its R&D effort, obtained six patents. All of these patents were obtained with the 636 patent cited as prior art. At least four of those patents actually covered the commercial product. Now, I realize infringement isn't before this court, so the full extent to appreciate the differences between the product aren't probably before this court, but this was not a copy. If Woodstream wanted to copy or clone the Agrizat product, it didn't need three years of research and development that resulted in six patents to do so. I think the proof is in the pudding of the images. If Agrizat believed that it could have made more money by selling to third parties than by selling to Woodstream, then why did it? There was no contractual obligation to sell to Woodstream. This was an at-will purchase order arrangement, much to Woodstream's chagrin, much to Woodstream's concern, because Woodstream was concerned, as the testimony of Charles pointed out, that we can get cut out from under this at any time, and we're going to have to go to our big-box customers, the target agents, and explain that we don't have any product to sell. I think we'd better leave it there. Thank you. Thank you, Mr. Stavosky. Mr. Mark. Yes, Your Honor, I appreciate the opportunity to reserve those. Well, actually, he didn't address Claim 16. I'm trying to see if there was any cross-appeal issue that was addressed. Your cross-appeal is limited to Claim 16, right? Yeah, and the Claim 1 issues, which are cross-appeals. I think we can't allow you to address issues on which there wasn't a cross-appeal, so I think we'll have to terminate it there. Just one thing, Your Honor. He did raise something on his claim about the representation that I just wanted to address for you. The representation? I'm sorry. Their theory has been that the representation was only that they were going to clone, meaning patent infringement, but that was not the representation. That doesn't have anything to do with it. I think we'd better leave it there. Thank you, Your Honor. I appreciate it very much. Thank you. The case is submitted. Thank you. The Honorable Court has adjourned until tomorrow morning at 10 a.m. Thank you.